**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| DALC GEAR & BEARING SUPPLY CORP., on behalf of itself and all others similarly situated,<br><br>                Plaintiff,<br><br>    v.<br><br>JTEKT CORPORATION, KOYO CORPORATION OF U.S.A., NACHI-FUJIKOSHI CORP., NACHI AMERICA INC., NSK LTD., NSK AMERICAS, INC., SCHAEFFLER AG, SCHAEFFLER GROUP USA INC., AB SKF, NTN CORPORATION, and NTN USA CORPORATION,<br><br>                Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**DEMAND FOR JURY TRIAL**</u> |

<u>**SUMMARY OF THE CASE**</u>

1.     Plaintiff DALC Gear & Bearing Supply Corp., individually and on behalf of the Plaintiff Class of direct purchasers described below, brings this action against Defendants for damages and injunctive relief under the antitrust laws of the United States.  Defendants are manufacturers and suppliers of automotive and industrial machinery bearings ("Bearings") sold in the United States.

2.     Plaintiff alleges that Defendants agreed, combined and conspired to inflate, fix, raise, maintain, or artificially stabilize prices of Bearings sold in the United States from at least as early as January 1, 2004 through the present.  Plaintiff further alleges that Defendants fraudulently concealed their conspiracy.

3.      As a result of Defendants' unlawful conduct, Plaintiff and members of the proposed Class paid higher prices for Bearings than they would have paid in a competitive market.

4.      Plaintiff brings this lawsuit as a class action on behalf of direct purchasers who, during the Class Period, purchased Bearings in the United States from one or more Defendants. This action is brought under Section 1 of the Sherman Act to enjoin Defendants' anticompetitive conduct and recover damages suffered by the Class.

## JURISDICTION AND VENUE

5.      Plaintiff brings this action to obtain injunctive relief and to recover damages, including treble damages, and costs of suit and reasonable attorneys' fees, resulting from Defendants' violation of the Sherman Act, 15 U.S.C. § 1.

6.      The Court has jurisdiction over the subject matter of this action pursuant to Sections 4(a) and 16 of the Clayton Act, 15 U.S.C. § 15 and 26, and 28 U.S.C. § 1331 and 1337. Venue is proper in this district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c) and (d) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside in this District.

7.      By virtue of their nationwide contacts and activities, Defendants are subject to the jurisdiction of this Court.  Alternatively, there is jurisdiction over the foreign Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2).

## DEFINITIONS

8.      The term "Class Period" as used in this complaint, refers to the time period from January 1, 2004 through the present.

9.      The term "Bearings" as used in this complaint, refers to both automotive and industrial machinery bearings.  Examples include, but are not limited to, the following products: ball bearings, tapered roller bearings, roller bearings, and mounted bearings.

10.     The term "Defendant" or "Defendants," as used in this complaint, refers to, in addition to those named specifically above, all of the named Defendants' predecessors, including Bearings manufacturers merged with or acquired by the named Defendants and each named Defendants' wholly-owned or controlled subsidiaries or affiliates that sold Bearings directly to purchasers in the United States during the Class Period.

11.     References made herein to any corporation include any predecessors, successors, parents, subsidiaries, affiliates and divisions of that corporation.

## TRADE AND COMMERCE

12.     During the Class Period, each Defendant sold Bearings in the United States in a continuous and uninterrupted flow of interstate commerce.

13.     The business activities of the Defendants substantially affected interstate trade and commerce in the United States.

## PARTIES

### Plaintiff

14.     Plaintiff DALC Gear & Bearing Supply Corp. is a New York corporation with its principal place of business located in Brewster, New York.  Plaintiff purchased Bearings directly

from one or more Defendants during the Class Period and suffered injury as a result of Defendants' unlawful conduct.

**<u>Defendants</u>**

15.     Defendant JTEKT Corporation ("JTEKT") is a Japanese corporation with its principal place of business located in Osaka, Japan.  Defendant JTEKT – directly or through its subsidiaries, which it wholly-owned or controlled – manufactured and sold Bearings that were purchased in the United States, including in this District, during the Class Period.

16.     Defendant Koyo Corporation of U.S.A. ("Koyo") is a South Carolina corporation with its principal place of business in Westlake, Ohio.  It is a subsidiary of, and wholly-owned or controlled by, its parent, JTEKT.  Defendant Koyo sold Bearings that were purchased in the United States, including in this District, during the Class Period.  During the Class Period, its activities in the United States were under the control and direction of JTEKT.

17.     Defendant Nachi-Fujikoshi Corp. ("Nachi-Fujikoshi") is a Japanese corporation with its principal place of business located in Toyama, Japan.  Defendant Nachi-Fujikoshi – directly or through its subsidiaries, which it wholly-owned or controlled – manufactured and sold Bearings that were purchased in the United States, including in this District, during the Class Period.

18.     Defendant Nachi America Inc. ("Nachi America") is an Indiana corporation with its principal place of business in Greenwood, Indiana.  It is a subsidiary of, and wholly-owned or controlled by, its parent, Nachi-Fujikoshi.  Defendant Nachi America sold Bearings that were purchased in the United States, including in this District, during the Class Period.  During the Class Period, its activities in the United States were under the control and direction of Nachi-Fujikoshi.

19.     Defendant NSK Ltd. ("NSK") is a Japanese corporation with its principal place of business located in Tokyo, Japan.  Defendant NSK – directly or through its subsidiaries, which it wholly-owned or controlled – manufactured and sold Bearings that were purchased in the United States, including in this District, during the Class Period.

20.     Defendant NSK Americas, Inc. ("NSK Americas") is a Delaware corporation with its principal place of business in Ann Arbor, Michigan.  It is a subsidiary of, and wholly-owned or controlled by, its parent, NSK.  Defendant NSK Americas sold Bearings that were purchased in the United States, including in this District, during the Class Period.  During the Class Period, its activities in the United States were under the control and direction of NSK.

21.     Defendant Schaeffler AG is a German corporation with its principal place of business located in Herzogenaurach, Germany.  Defendant Schaeffler AG – directly or through its subsidiaries, which it wholly-owned or controlled – manufactured and sold Bearings that were purchased in the United States, including in this District, during the Class Period.

22.     Defendant Schaeffler Group USA Inc. ("Schaeffler Group USA") is a Delaware corporation with its principal place of business in Fort Mill, South Carolina.  It is a subsidiary of, and wholly-owned or controlled by, its parent, Schaeffler AG.  Defendant Schaeffler Group USA sold Bearings that were purchased in the United States, including in this District, during the Class Period.  During the Class Period, its activities in the United States were under the control and direction of Schaeffler AG.

23.     Defendant AB SKF ("SKF") is a Swedish corporation with its principal place of business located in Göteborg, Sweden.  Defendant SKF – directly or through its subsidiaries, which it wholly-owned or controlled – manufactured and sold Bearings that were purchased in the United States, including in this District, during the Class Period.

24.     Defendant NTN Corporation ("NTN") is a Japanese corporation with its principal place of business located in Osaka, Japan.  Defendant NTN – directly or through its subsidiaries, which it wholly-owned or controlled – manufactured and sold Bearings that were purchased in the United States, including in this District, during the Class Period.

25.     Defendant NTN USA Corporation ("NTN USA") is a Delaware corporation with its principal place of business in Mount Prospect, Illinois.  It is a subsidiary of, and wholly-owned or controlled by, its parent, NTN Corporation.  Defendant NTN USA sold Bearings that were purchased in the United States, including in this District, during the Class Period.  During the Class Period, its activities in the United States were under the control and direction of NTN.

26.     To the extent that subsidiaries, divisions and other affiliates within Defendants' corporate families sold Bearings to direct purchasers, these related entities played a material role in the conspiracy alleged in this complaint because Defendants wished to ensure that the prices paid for such Bearings would not undercut the artificially raised and inflated pricing that was the aim and intended result of Defendants' coordinated and collusive behavior as alleged herein. Thus, all such entities within the corporate family were active, knowing participants in the conspiracy alleged herein, and their conduct in selling, pricing, distributing or collecting monies from Plaintiff and the members of the Class was known to and approved by their respective corporate parent named as a Defendant in this complaint.

## CO-CONSPIRATORS

27.     Persons and entities not named as Defendants have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof.  The Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this complaint.

28.     Each Defendant acted as the agent or joint venturer of or for other Defendants with respect to the acts, violations and common course of conduct by said co-conspirators alleged by Plaintiff herein.

## CLASS ACTION ALLEGATIONS

29.     Plaintiff brings this action both on behalf of itself and all others similarly situated (the "Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and (b)(3).  The Class is defined as follows:

> All individuals and entities who purchased Bearings in the United States directly from one or more of the Defendants (or their controlled subsidiaries, affiliates, or joint ventures) from at least as early as January 1, 2004 through the present.

30.     Plaintiff does not know the exact number of Class members, such information being in the exclusive control of Defendants.  Due to the nature of the trade and commerce involved, however, Plaintiff believes that the Class is so numerous and geographically dispersed throughout the United States that joinder of all Class members is impracticable.

31.     There are questions of law or fact common to the class:

a.      Whether Defendants engaged in a contract, combination, or conspiracy to fix, raise, maintain, or stabilize prices of Bearings sold in the United States;

b.      The identity of the participants of the alleged conspiracy;

c.      The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

d.      Whether the alleged conspiracy violated the Section 1 of the Sherman Act;

   e.  Whether the contract, combination, or conspiracy caused Bearings prices to be higher than they would have been in the absence of Defendants' conduct;

   f.  Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the other Class members;

   g.  Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiff and other Class members;

   h.  Whether Plaintiff and other Class members are entitled to injunctive relief and, if so, the nature and extent of such relief; and

   i.  The appropriate class-wide measure of damages.

32.  These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

33.  Plaintiff's claims are typical of the claims of the Class because Plaintiff directly purchased Bearings from a Defendant, all Class members were damaged by the same conspiracy alleged herein, and the relief sought by Plaintiff is common to the Class.

34.  Plaintiff will fairly and adequately represent the interests of the Class in that Plaintiff is a direct purchaser of Bearings and has no conflict with any other members of the Class.  Furthermore, Plaintiff has retained competent counsel experienced in antitrust, class action, and other complex litigation.

35.  Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

36.     A class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.  Prosecution of this matter as a class action will eliminate the possibility of repetitive litigation and there are no inherent barriers to managing the case as a class action.

37.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying outcomes.

38.     The Class is also readily definable and is one for which records likely exist in the files of Defendants and their co-conspirators.

## INDUSTRY BACKGROUND

### Bearings Background and Market Size

39.     Bearings are friction-reducing devices that allow one moving part to glide past another moving part.  Rolling bearings include both ball bearings and roller bearings.

40.     Ball bearings, also known as anti-friction bearings, are the most common type of bearing and are small metallic or ceramic spheres used to reduce friction between axles and shafts in numerous applications.  Ball bearings are often used in individual cages to reduce friction in axle assemblies or in a series to absorb the weight placed on a moving part.  Ball bearings are commonly found in fans, roller blades, wheel bearings, and under hood applications on cars.  See Figure 1.



Figure 1

41.     Roller bearings, unlike ball bearings, use cylinders instead of spheres.  Therefore, the load is spread over a larger area enabling the bearing to handle greater loads than ball bearings.  Roller bearings include spherical roller bearings, needle roller bearings, cylindrical roller bearings, thrust roller bearings, and tapered roller bearings.

42.     Tapered roller bearings are the second most popular bearing type, with only deep groove ball bearings more common.  Tapered roller bearings are generally found in heavy industrial, truck and wheel applications with combined radial and axial loads.  Some examples are manual transmissions, gearboxes, power generation and other process equipment.  These bearings use conical rollers that run on conical races.  Unlike other roller bearings, they support both radial and axial loads, and are able to carry higher loads.  The conical geometry of tapered roller bearings provides a larger contact patch, which allows greater loads to be carried as compared to spherical (ball) bearings.  Due to manufacturing complexities, tapered roller bearings are generally more expensive than ball bearings.  See Figure 2.



Figure 2

43.     The global Bearings market is generally viewed as the worldwide sales of rolling bearings, which consist of ball and roller bearings.

44.     Sales of Bearings in the U.S. totaled approximately $7.1 billion in 2008 and approximately $8.5 billion in 2011.  In 2011, the global Bearings market grew to approximately $45 billion.  The global Bearings market is predicted to reach $63.4 billion by 2015.  The automotive industry has been the primary user of tapered roller bearings and ball bearings.

45.     Defendants and their co-conspirators manufactured Bearings: (a) in the United States for installation in vehicles and industrial machinery manufactured and sold in the United States and (b) abroad for export to the United States and installation in vehicles and industrial machinery and sold in the United States.

**Industry Concentration and Market Characteristics**

46.     There are high barriers to entry in the Bearings market due to high capital investment in plant and machinery and technical expertise.  As a result, the Bearings industry is heavily concentrated and therefore it is easier for the market participants to collude.

47.     Both the global and domestic markets for Bearings are heavily concentrated.

48.     In 2011, Defendants' global market share exceeded 60%.

49.     Throughout the Class Period, Defendants' annual sales in the United States totaled several billion dollars, comprising much of the total U.S. sales during the same period.

50.     One of the most important determinants in the purchase of Bearings is price. Bearings produced by one Defendant can be substituted for those produced by the other Defendants. Defendants and their co-conspirators have the capacity and expertise needed to manufacture Bearings that can be used in any vehicle or industrial machinery.

51.     Defendants and their co-conspirators control substantially all of the market for the manufacture and sale of Bearings sold in the United States for use in vehicles and industrial machinery.

52.     The demand for Bearings is highly inelastic because there are no close substitutes for Bearings. In a market where demand is inelastic, collusion is facilitated as consumers cannot substitute products. Thus, producers can raise prices to supracompetitive levels without losing revenue. In a market where demand is inelastic, purchasers are forced to pay these supracompetitive prices.

53.     Because Bearings are essential components in vehicles and industrial machinery, customers were forced to purchase these products at supracompetitive prices throughout the Class Period.

## THE CONSPIRACY

54.     During the Class Period, Defendants and their co-conspirators had opportunities to meet and perform acts in furtherance of their conspiracy while meeting at industry events.

55.     Defendants and their co-conspirators participated in meetings, conversations, and communications to discuss pricing for Bearings sold in the United States.

56.     Defendants and their co-conspirators agreed during those meetings, conversations, and communications to coordinate pricing of Bearings sold in the United States.

57.     Defendants knew and intended that their pricing actions regarding their sales of Bearings would have a direct impact on prices for Bearings for all direct purchasers of Bearings throughout the United States.

58.     Defendants NSK, NTN, Schaeffler, Nachi-Fujikoshi, Koyo and SKF are six of the seven members of the World Bearing Association ("WBA").  The WBA, comprised of the seven largest Bearings manufacturers in the world, was created in 2006.  Its founding member associations include the American Bearing Manufacturers Association, the Japanese Bearing Industrial Association and the Federation of European Bearing Manufacturers.  The WBA afforded these six defendants the opportunity to engage in improper discussions and perform acts in furtherance of their price-fixing conspiracy.  The WBA has been referred to as the "World Cartel of Bearing manufacturers" and in September 2011 was reportedly on the verge of "extinction."  As of September 2011, the WBA was not registered, not incorporated, had no Articles of Association, had no record of any meetings and had not filed documents with any government department globally.  The WBA no longer has a president, contact information, place of identification or postal address.

59.     The WBA likewise initiated a campaign, "Stop Fake Bearings," (found online at http://www.stopfakebearings.com) ostensibly to identify and prevent counterfeiting in the bearings industry.  However, upon information and belief, this was a sham campaign, developed by the WBA solely so that its members could maintain their illegally attained hold on the worldwide bearing market.

## GOVERNMENT INVESTIGATIONS

60.     Investigations into the Bearings industry are underway in the United States, Japan, and Europe.

61.     The United States Department of Justice ("DOJ") is conducting an investigation into the Bearings industry.  In November 2011 it served a subpoena on NTN's "United States consolidated subsidiary requesting the submission of information related to transactions in bearings."  Schaeffler similarly reported that it was a subject of the DOJ's bearings antitrust investigation.

62.     The Japan Fair Trade Commission ("JFTC") launched an investigation in July 2011 after Defendant JTEKT sought leniency by alerting the regulatory agency of the Bearings conspiracy.  JTEKT voluntarily confessed to the conspiracy and was exempted from a criminal complaint by the JFTC.

63.     On July 26, 2011, the JFTC conducted on-site inspections of Defendants NSK, NTN, JTEKT and Nachi-Fujikoshi amid suspicions that the companies violated Japan's anti-monopoly law in relation to their sales of Bearings.

64.     Subsequently, on November 8, 2011, the European Commission ("EC") announced that it had made unannounced inspections at the premises of companies that manufacture bearings for automotive and industrial use over concerns that these companies may have violated antitrust rules.  Defendants SKF and Schaeffler have admitted that their facilities were inspected by the EC.

65.      On June 14, 2012 the JFTC filed criminal charges against Defendants NSK, NTN and Nachi-Fujikoshi and seven individuals engaged in the sale of Bearings for violating Japan's Antimonopoly Act ("AMA").  The JFTC alleged that "these companies, as for the products at

issue, in cooperation with one another, contrary to the public interest, substantially restrained competition in the field of trade on sales for the product at issue by mutually restricting their business activities."  According to the Japan Times, the three companies have raised bearing prices five times since 2004 and the JFTC believes that these price increases were the result of cartel activity.

66.     A number of defendants have acknowledged that they are subjects of the Bearings investigations.  JTEKT has admitted that the EC is investigating its Dutch unit as part of the EC's Bearings antitrust investigation.

67.     Likewise, in its 2011 Annual Report, SKF explained that, along with other companies in the Bearing industry, it is "part of an investigation by the European Commission regarding a possible violation of EU antitrust rules."  SKF has also acknowledged that EU officials have visited its Gothenburg, Sweden and Schweinfurt, Germany facilities.

68.     In its 2011 Annual Report, NSK stated that it "intend[ed] to cooperate fully with the [JFTC] investigation" after acknowledging that "in July 2011 the Japan Fair Trade commission conducted on-site investigations of NSK on suspicion that sales of certain products infringed upon Japan's Antimonopoly Act."

69.     Schaeffler AG's 2001 Annual Report acknowledges the worldwide Bearings antitrust investigation, noting, "[t]he European Commission as well as the US Department of Justice have commenced antitrust investigations of various manufacturers of rolling bearings, including Shaeffler.  The European and the U.S. competition authorities are investigating whether manufacturers of rolling bearings participated in unlawful agreements and/or concerted practices concerning rolling or plain bearings."

70.     NTN reported in its 2011 Financial Report that:

[i]n July, the Company underwent an on-site inspection by the Japan Fair Trade Commission into domestic transactions on bearings, on suspicion that the Company had decided to raise sale prices in cooperation with other manufacturers, and in April this year a search was carried out by special investigators from Tokyo District Public Prosecutor's Office and the Fair Trade Commission.  In November 2011, our European consolidated subsidiaries also received an on-site inspection by the European Commission into transactions in bearings, on suspicion of noncompliance with the EU Competition Law. Furthermore, in November 2011 our United States consolidated subsidiary received a subpoena from the United States Department of Justice requesting the submission of information related to transactions in bearings.

71.     The Japan Times also has reported that certain NTN officials have made statements admitting to their participation in the Bearings price-fixing conspiracy during voluntary questioning by Japanese prosecutors.  Officials of NSK, JTEKT and Nachi-Fujikoshi have already admitted to their roles in the conspiracy.

72.     According to sources, the JFTC said it "believes the culture of collusion is ingrained in the bearing industry."  In 1973, the JFTC similarly found that NSK, Koyo Seiko Co. (currently JTEKT), Nachi-Fujikoshi and NTN Toyo Bearing Co. (currently NTN) formed a cartel and held secret meetings at which they fixed bearings prices.  In 2002, the French Conseil de la Concurrence (Competition Council) fined four bearings manufacturers €19 million for their participation in a price-fixing cartel that was active from 1993 through 1997.  The cartel included three participants in the present Bearings price-fixing cartel, Defendants SKF, Schaeffler and NSK.

**FRAUDULENT CONCEALMENT**

73.     Defendants and their co-conspirators affirmatively and wrongfully concealed their anticompetitive conduct from Plaintiff and the Class from at least January 1, 2004 through at least July 2011, when the antitrust investigations of Bearings manufacturers became public. During that time, Plaintiff and the Class did not learn or discover the operative facts giving rise

- 16 -

to their claims, despite due diligence.  Thus, Defendants' fraudulent concealment tolled the statute of limitations through at least July 2011.

74.     Defendants and their co-conspirators' successful contract, combination, or conspiracy was by its nature inherently self-concealing.

75.     Defendants and their co-conspirators represented publicly, both to customers and otherwise, that their pricing activities were unilateral.  In making those false representations, Defendants misled Plaintiff and members of the Class as to the true, collusive, and coordinated nature of their price-fixing activities.

76.     Defendants and their co-conspirators' wrongful conduct was carried out in part through means and methods that were designed to avoid detection, and which, in fact, successfully precluded detection.

77.     In particular, Defendants and their co-conspirators participated in meetings, conversations, and communications to discuss price-fixing that affected customers in the United States and elsewhere.

78.     During these secret meetings, conversations, and communications, Defendants and their co-conspirators agreed upon prices affecting customers in the United States and elsewhere.

79.     As a result of their secret coordinated actions, and unbeknownst to Plaintiff and the Class, Defendants and their co-conspirators sold Bearings to purchasers in the United States at collusive and supracompetitive prices.

80.     Despite due diligence, Plaintiff had no knowledge of Defendants and their co-conspirators' unlawful contract, combination, or conspiracy.

81.     Plaintiff received various pricing information from one or more of Defendants or their co-conspirators.  Plaintiff had no way to know that these prices were higher than they should have been due to the conspiracy alleged herein.

82.     Plaintiff did not and could not have discovered Defendants and their co-conspirators' unlawful contract, combination, or conspiracy at any earlier date, despite due diligence.  Defendants and their co-conspirators undertook affirmative acts of concealment of their contract, combination, or conspiracy, including their attendance at secret meetings, making misrepresentations to Plaintiff and the Class of the reasons for the prices charged, and engaging in secret conversations concerning the price-fixing of Bearings.

## ANTITRUST INJURY

83.     Defendants' conspiracy caused injury to Plaintiff and members of the Class by suppressing price competition among Bearings manufacturers, thereby depriving all direct purchasers of Bearings of the benefits of a competitive market and resulted in the setting of prices of Bearings at artificially high levels.

84.     As a direct result of Defendants' conspiracy, Plaintiff and members of the Class have been injured in their business or property in that they paid more for Bearings than otherwise would have been the case in a competitive market.

## CLAIM FOR RELIEF

### (Sherman Act Section 1 – Horizontal Price-Fixing Against All Defendants)

85.     Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

86.     During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, combination or conspiracy in restraint of trade to artificially raise, fix,

maintain, or stabilize prices for Bearings sold in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

87.   The contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among the Defendants and their co-conspirators in furtherance of which the Defendants and their co-conspirators fixed, raised, maintained, or stabilized prices for Bearings sold in or into the United States.  Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws.

88.   Defendants succeeded in fixing, raising, maintaining and stabilizing the prices of Bearings sold in the United States during the Class Period.

89.   The conspiracy among Defendants consisted of a continuing agreement, understanding and concerted action among Defendants and their co-conspirators.

90.   For purposes of formulating and effectuating their conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

a.   Restraining trade or commerce by fixing, controlling or maintaining, at artificial and supracompetitive levels, the prices at which Bearings were sold in the United States;

b.   Manipulating prices of Bearings sold in the United States in a manner that deprived direct purchasers of free and open competition;

c.   Selling Bearings to direct purchasers in the United States at supracompetitive prices; and

d.   Employing measures to conceal the true nature of their unlawful conduct from Plaintiff and other members of the Class in furtherance of the conspiracy.

91.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the other members of the Class have been injured in their businesses and property in that they have paid more for Bearings than they otherwise would have paid in a competitive market.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf and on behalf of the Class herein, and respectfully requests the following relief:

A.     That the Court determine that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, with Plaintiff as the designated Class representative and its counsel as Class Counsel;

B.     That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this complaint, be adjudicated and decreed a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. §1;

C.     That Plaintiff and members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiff and the Class be entered against the Defendants in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. §15(a);

D.     That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

E.     That Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

F.     That Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest in accordance with law; and

G.     That Plaintiff and members of the Class receive such other or further relief as may be just and proper.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

Dated:  September 11, 2012                    Respectfully Submitted,

FINK + ASSOCIATES LAW

By: /s/ David H. Fink
David H. Fink (P28235)
Darryl Bressack (P67820)
**FINK + ASSOCIATES LAW**
100 West Long Lake Road: Ste. 111
Bloomfield Hills, MI 48304
Telephone: (248) 971-2500
dfink@finkandassociateslaw.com
dbressack@finkandassociateslaw.com

Steven A. Kanner
William H. London
Michael E. Moskovitz
Michael L. Silverman
**FREED KANNER LONDON & MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4510
skanner@fklmlaw.com
wlondon@fklmlaw.com
mmoskovitz@fklmlaw.com
msilverman@fklmlaw.com

Eugene A. Spector
William G. Caldes
Jonathan M. Jagher
Jeffrey L. Spector
**SPECTOR ROSEMAN KODROFF**
**& WILLIS, P.C.**
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
espector@srkw-law.com
bcaldes@srkw-law.com
jjagher@srkw-law.com
jspector@srkw-law.com

Joseph C. Kohn
William E. Hoese
Douglas A. Abrahams
**KOHN, SWIFT & GRAF, P.C.**
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
jkohn@kohnswift.com
whose@kohnswift.com
dabrahams@kohnswift.com

W. Joseph Bruckner
Craig S. Davis
Julie A. Strother
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South
Minneapolis, MN 55401
Telephone: (612) 339-6900
wjbruckner@locklaw.com
csdavis@locklaw.com
jastrother@locklaw.com

Jason J. Thompson (P47184)
Lance C. Young (P51254)
**SOMMERS SCHWARTZ PC**
2000 Town Center, Suite 900
Southfield, MI 48075
Telephone: (248) 355-0300
jthompson@sommerspc.com
lyoung@sommerspc.com

Attorneys for Plaintiff DALC Gear & Bearing
Supply Corp. and the Proposed Class